IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

PHILIP C. HOGAN,

                              Plaintiff,                        OPINION AND ORDER

    v.

                                                          24-cv-248-wmc

DR. MARIE L. HERWEIJER and
STACI L. HEIMSOTH,

                             Defendants.

Plaintiff Philip Hogan, representing himself, was previously granted leave to proceed with claims of deliberate indifference to his medical needs by a doctor and physical therapist working at Oakhill Correctional Institution ("Oakhill") in violation of the Eighth Amendment, as well as a claim of medical negligence under Wisconsin law. (Dkt #9.) Specifically, plaintiff contends that (1) Dr. Marie Herweijer should have promptly ordered more tests and accommodations to help treat and manage plaintiff's injuries suffered after a fall, and (2) Staci Heimsoth, P.T., provided inadequate physical therapy. Before the court is defendants' motion for summary judgment (dkt. #19), which the court will grant for the reasons explained below.

UNDISPUTED FACTS[1]

## A. The Parties

During the relevant time period, plaintiff Philip Hogan was in the custody of the Wisconsin Department of Corrections ("DOC") and incarcerated at Oakhill, where

---

[1] Unless otherwise indicated, the following facts are material and undisputed as drawn from defendants' reply in support of their proposed findings of fact. (Dkt. #33.)

defendants -- Marie L. Herweijer, M.D., and Staci Heimsoth, P.T. -- were both employed by the DOC.  Defendants Herweijer and Heimsoth were both aware of the medical history involving Hogan's knees, including left meniscus and chondroplasty knee surgery; chronic left knee pain; and osteoarthritis ("OA") in both knees.[2]

## B.  Plaintiff's Treatment

On January 4, 2024, Hogan was seen in the Oakhill Health Services Unit ("HSU") for knee injuries he suffered from a fall.  Specifically, Hogan reported that: his left knee got twisted; his right knee got scraped; both knees hit the ground; his resting pain was a 6 out of 10; his moving pain was an 8 to 9 out of 10; his left knee was stiff and slightly moving; his right knee had no movement issues; and he had a history of a torn meniscus of his left knee.  After review, an Advanced Practice Nurse Practitioner ("APNP") sent Hogan to the University of Wisconsin ("UW") Hospital Emergency Room ("E.R.") for an x-ray and further evaluation.

At that time, the physical examination of his right knee showed full range of motion without pain or instability, but noted medial joint line and medial patella tenderness, and his left knee showed no pain on palpation of the joint line, but pain was elicited using varus pressure.  Moreover, the x-ray showed no evidence of fracture.  The emergency room physician diagnosed Hogan's right knee with a contusion and his left knee with a sprain,

---

[2] Meniscus and chondroplasty involves cartilage repair, while OA is a chronic condition, which typically worsens over the years, especially in one who has had prior surgery to that joint or substantial "wear and tear" of the joints involved.  Further, "insults" (such as injuries or even normal activities) can aggravate or accelerate the condition.  Eventually, treatment by a joint replacement may become necessary where OA is severely advanced -- typically, when the joint has become "bone-on-bone."  (Dkt. #22, at ¶11.)

discharging him with instructions to continue supportive care with plenty of rest, fluids, Tylenol (1 gram every 6 hours), ibuprofen (600 mg every 4-6 hours), compression, and elevation.  The physician also recommended that Hogan get a referral to orthopedics.

On January 11, 2024, Dr. Herweijer was alerted to Hogan's request for a low bunk and offsite consultation with orthopedics, prompting her to schedule an appointment with her for January 16.  During that exam,  Dr. Herweijer observed:  Hogan walking slowly with a limp; his right knee grinding under the patella upon extension of his leg with tenderness to palpation at the medial joint line and notable pain when stressing the medial collateral ligament; and his left knee grinding under the patella with tenderness to palpation at the medial joint line and possible looseness of the medial collateral ligament causing pain, a clicking, and noted swelling.  As a result, Dr. Herweijer concluded that: Hogan's left knee had an acute injury on top of his previous chronic left knee pain with swelling, as well as possible internal injuries; Hogan's right knee had an acute sprain; and there were no red flags requiring urgent treatment.  (Dkt. #22-1, at 32-33.)

Based on these findings and Hogan's health history as to both knees, Dr. Herweijer decided to see if conservative treatment would address Hogan's pain, including physical therapy, a low bunk restriction, ibuprofen, and Tylenol.  She also explained this approach to Hogan.  (*Id.*)  In the meantime, Dr. Herweijer also ordered an MRI of Hogan's left knee and made a referral to orthopedics.  (*Id.*)  Based on her diagnosis, Dr. Herweijer did not believe it necessary to order an MRI of Hogan's right knee nor to restrict his use of stairs. Rather, she concluded that physical therapy evaluations would give a better assessment on what activities Hogan should or should not do.  Finally, Hogan believed that his constant

complaint of pain was a "red flag" requiring attention.  (Dkt. #31-2.)

On January 25, 2024, Hogan went to physical therapy with defendant Heimsoth for the first time.  Hogan had already been provided ankle and knee braces, but did not wear either to that appointment.  To begin the January 25th session, Hogan asked Heimsoth to order a stairs restriction, adaptive recreation, an extra pillow, and an MRI of his right knee.  During that same session, Heimsoth noted that Hogan walked with a "full stance," but still decided to order a 60-day stairs restriction, reasoning that this should be enough time to recover from the injuries listed in his E.R. notes from UW Hospital.  Heimsoth also gave Hogan a pair of crutches to increase his comfort during ambulation and instructed him on exercises to perform between P.T. sessions.  However, she denied the following: adaptive recreation, because Hogan already had full access to bikes; an extra pillow, because it was not medically necessary; and a right knee MRI, because as a P.T. she could not lawfully order it.  On February 8, Hogan had another physical therapy session with Heimsoth.  Hogan again arrived without his knee or ankle braces and demonstrated inconsistencies (i.e., insisting on adaptive recreation to ride a bike, while refusing to bend his left knee, ostensibly because it hurt too much).  On February 15, Hogan filed an inmate complaint against Heimsoth for demeaning, hostile, and unnecessary comments she allegedly made when he would not perform the instructed exercises.

Also on February 15, UW Radiology took an MRI of Hogan's left knee.  The MRI results were first reviewed with him by Heimsoth during another physical therapy session on February 19.  Hogan had once again arrived without wearing his knee braces, was improperly using his crutches, and would not bend his left in therapy because it was too

4

painful, all despite his continued interest in getting adaptive recreation approval to ride a bike. In the end, Heimsoth provided further instruction on physical exercises and placed a 90-day adaptive recreation order. However, she discontinued Hogan's physical therapy, citing an unwillingness to cooperate.

On February 21, 2024, Hogan next went to UW Orthopedics. Because the MRI showed some degenerative findings, a UW Orthopedic provider, Dr. McKean, stated that Hogan's left knee "[was] likely dealing with an arthritis exacerbation," not an "ACL or meniscal injury given his presentation." (Dkt. #22-1, at 109.) As to Hogan's right knee, Dr. McKean ordered an MRI. Pending further results, however, Dr. McKean also believed "conservative management at this point in time is likely the best course of treatment" and ordered that Hogan receive cortisone shots in both knees, hopefully to provide him some long-lasting relief. (*Id.* at 109-10.)

Given this report by an orthopedic specialist, Dr. Herweijer concluded that she need not see Hogan again before an already-scheduled visit in May. In the meantime, Herweijer noted that Hogan had ibuprofen and Tylenol, can be offered capsaicin cream, had crutches, and knows what to do for physical therapy. During this same time, HSU also sent Hogan a letter reminding him again that: Orthopedics recommended conservative care and an MRI of the right knee; both were being done; and the plan was to see what the MRI of his right knee showed and "go from there." On March 19, 2024, Hogan had an MRI of his right knee at UW Radiology, which revealed a medial meniscus tear and small joint effusion, but intact medial collateral and other ligaments.

In April, Hogan requested to continue his low-bunk and stair restrictions. Dr.

Herweijer presented Hogan's case for extending his low-bunk restriction to the Class III Committee, which was granted. Despite Hogan's complaints of pain from stair use, however, this restriction was denied as "not medically necessary" because physical therapy stated a stair restriction should not extend beyond 60-days *and* Hogan had 125 degrees of knee flexion in both knees, which is more than adequate for the use of steps. (Dkt. #22, at ¶ 63; dkt. #22-1, at 108-09.)

On May 15, Hogan returned to UW Orthopedics for a follow up on his right knee MRI. Dr. May reviewed with Hogan that no arthroscopic surgery would likely provide substantial benefit given his arthritis; stated that she would review the case with her arthroplasty colleagues to see if a total knee replacement could be an option; and provided Hogan with a cane. During this meeting, Hogan stated that he would like to address his left knee prior to his right.

On May 20, Dr. Herweijer followed up with Hogan, discussing his orthopedic consult and the difficulty in determining if surgery should be offered. Specifically, Herweijer explained that he would likely need a knee replacement at some point, but may be considered too young at this point. A few weeks later, on July 9, 2024, however, Dr. Herweijer was notified that UW called to schedule a knee replacement surgery. After this, Dr. Herweijer obtained approval for the procedure from DOC, allowing Hogan to proceed with a total left knee replacement on September 4.

Finally, on September 12, 2024, Hogan was transferred out of Oakhill. Dr. Herweijer then wrote to Hogan's new providers, requesting they "PLEASE make sure [Hogan] gets started on P.T. immediately if [he] has not already. Thank you!" (Dkt. #22-

l, at 42-43.)

OPINION

On this record, plaintiff claims that: defendant Herweijer, M.D., failed to act quicker to order additional accommodations and tests; and defendant Heimsoth, PT, failed to provide adequate physical therapy services.  Plaintiff contends that both failures amount to deliberate indifference to his serious medical needs in violation of the Eighth Amendment.  Defendants have moved for summary judgment, arguing that all of plaintiff's claims fail because his medical records demonstrate that throughout defendants' care for plaintiff's knee injuries, both properly exercised professional medical judgment.

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Generally, the parties seeking summary judgment have the initial burden of showing that there is no genuine dispute of fact, entitling them to judgment as a matter of law.  *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010).  If that initial burden is met, then the non-moving party must show that material, disputed issues of fact exist, which prevent the entry of summary judgment.  *Id.*

However, "[t]he nonmoving party must do more than simply show that there is *some metaphysical doubt* as to the material facts." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (emphasis added)).  "The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive a summary judgment motion; there must be evidence on which the jury could reasonably find in favor of the nonmoving

7

party." *Id*. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087-88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

While pro se litigants are entitled to liberal construction of their pleadings, that "status doesn't alleviate his burden on summary judgment," meaning an unrepresented plaintiff must still come forward with evidence that demonstrates a genuine issue of material fact.  *Arnett v. Webster*, 658 F.3d 742, 760 (7th Cir. 2011) (citation omitted).  Moreover, while the court must view the record "in the light most favorable to the nonmovant and constru[e] all reasonable inferences from the evidence in his favor," *Moore v. Western Ill. Corr. Ctr.*, 89 F.4th 582, 590 (7th Cir. 2023), a nonmovant is only entitled to favorable inferences that are supported by admissible evidence, not those based upon mere "speculation or conjecture." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

Here, plaintiff's primary claim is that defendants failed to adequately treat his medical needs in violation of the Eighth Amendment, which prohibits "cruel and unusual punishments" caused by deliberate indifference to conditions resulting in the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  Said another way, although the U.S. Constitution does not mandate "comfortable" prisons, government officials have a duty under the Eighth Amendment to provide "humane conditions of confinement" by ensuring that inmates receive adequate food, clothing, shelter, and

medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To succeed on a claim of constitutionally inadequate medical care in particular, therefore, an inmate "must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment" or "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Donald v. Wexford Health Sources*, Inc., 982 F.3d 451, 458 (7th Cir. 2020) (citations and internal quotations omitted). As for proof of the requisite deliberate indifference, a plaintiff must prove a prison official "*actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (emphasis in original) (citing *Farmer*, 511 U.S. at 837); *see also Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022) (same).

In particular, the Seventh Circuit recognizes that proof of deliberate indifference is "a high bar 'because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (quoting *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012)). Thus, when a prisoner has received treatment for his medical condition, courts will generally defer to a medical professional's judgment as to the adequacy of that care *unless* a plaintiff introduces evidence of defendant's departure from ordinary care by: "refus[ing] to take instructions from a specialist"; "fail[ing] to follow existing protocol"; "persist[ing] in a course of treatment known to be ineffective"; "choos[ing] easier and less efficacious

9

treatment without exercising professional judgment"; or "inexplicably delay[ing] [] treatment which serves no penological interest." *Petties*, 836 F.3d at 729-31 (internal citations and quotations omitted).  For the reasons explained below, no reasonable jury could find either defendant acted with deliberate indifference to plaintiff's objectively serious medical need.

## I.  Defendant Herweijer, M.D.

To the contrary, the undisputed record shows that defendant Herweijer, M.D., made affirmative, reasonably prompt efforts to assess *and* address plaintiff's complaints as reported to her.  Further, her actions were objectively far from anything approaching an act or failure to act with deliberate indifference to plaintiff's medical needs.  Beginning with their first meeting after plaintiff's fall, Dr. Herweijer identified that there were no red flags requiring urgent treatment and promptly set a plan of care: (1) continuing the conservative treatment recommended by plaintiff's ER doctors at UW Hospital, including plenty of rest, fluids, Tylenol (1 gram every 6 hours), ibuprofen (600 mg every 4-6 hours), compression, elevation, physical therapy and a low-bunk restriction; (2) seeking further information on the extent of his injuries, by ordering an MRI of Hogan's left knee, which appeared to show less mobility and more pain; and (3) referring him to orthopedics.  In the following weeks, as his recovery slowed, plaintiff also received a stair restriction; his left knee MRI did not show an ACL or meniscal injury; he was scheduled for and received a right knee MRI, showing a medial meniscus tear; and he met with orthopedics twice, who as the experts also recommended *continued* conservative treatment pending review to determine whether total knee replacement might be appropriate despite plaintiff's

relatively young age for such a procedure. When Dr. Herweijer next met with plaintiff in May, she also explained that plaintiff would likely need a knee replacement at some point, but that his young age may be a barrier. However, when UW orthopedics called a few weeks later to schedule a knee replacement for plaintiff, Dr. Herweijer promptly placed the formal order and presented the case for its eventual approval to the DOC Class III Committee. Finally, after the procedure, Dr. Herweijer took steps to make sure that plaintiff was immediately referred to physical therapy at his new institution. Thus, at every step of plaintiff's care, Dr. Herweijer exercised professional judgment to ensure that plaintiff's needs were met, precluding any inference of deliberate indifference.

In opposition, plaintiff focuses on the three weeks after his fall -- from January 4 to January 25, 2024 -- when he did not have a stairs restriction despite complaints of extreme pain. However, this does not support a reasonable inference that Dr. Herweijer was acting with deliberate indifference. As discussed above, defendant Herweijer was providing continual conservative care, which was the same professional judgment plaintiff received from *every* physician who reviewed his case, including from orthopedic specialists at UW Hospital to whom she had a right (if not obligation) to defer. Additionally, plaintiff does not dispute that it is safer to have a physical therapist, and not Dr. Herweijer, provide guidance on what activities are best for recovery -- such as stair restrictions or adaptive recreation -- conceding that Dr. Herweijer's decision to defer to physical therapy an appropriate exercise of judgment. (Dkt. #33, at ¶57.) Regardless, absent evidence that Dr. Herweijer deviated from professional judgment, plaintiff is left with only his subjective complaints of pain and personal dissatisfaction with how his case was handled, which is

11

insufficient to show deliberate indifference. *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (Eighth Amendment does not entitle incarcerated patients to their preferred treatment nor guarantee a "pain free" recovery). Accordingly, no reasonable jury could find that Dr. Herweijer was deliberately indifferent to plaintiff's condition, and she is entitled to summary judgment as a matter of law on his Eighth Amendment claim.

## II. Defendant Heimsoth, PT

Plaintiff contends that PT Heimsoth was deliberately indifferent to his pain because she asked him to do exercises that hurt him, she knew he was in extreme pain, and she created a hostile environment, all before ending their physical therapy sessions. However, the undisputed record shows that after Dr. Herweijer's referral, Heimsoth met with plaintiff three times, during which she: instructed plaintiff on exercises and the importance of continuing use of his knees; provided crutches; and ordered a 60-day stair restriction and 90-day adaptive recreation, both at plaintiff's request. Heimsoth's decisions to order additional accommodations, provide education on exercises she deemed appropriate, or claimed failure to provide any other therapy all fall within her exercise of professional judgment and simply do not give rise to a reasoanble inference of deliberate indifference, at least absent expert testimony to the contrary or an act or failure to act obviously falls outside the scope of reasonable care. *See Burton v. Downey*, 805 F.3d 776, 787 (7th Cir. 2015) (inmate could not sustain a claim of deliberate indifference when medical personnel at the prison instructed the inmate how to perform therapy in his cell); *see also Kyles v. Williams*, 679 F. App'x 497, 499 (7th Cir. 2017) (no finding of deliberate indifference when physical therapy stopped after eight sessions but taught inmate how to perform

exercise on his own) (unpublished).

Moreover, to the extent plaintiff was unhappy with PT Heimsoth's responses, regardless how rude they may have seemed, plaintiff was not entitled to dictate the terms of his otherwise reasonable care. *See Harper v. Santos*, 847 F.3d 923, 927-28 (7th Cir. 2017). Accordingly, no reasonable jury could conclude that Heimsoth was deliberately indifferent to plaintiff's condition, and she, too, is entitled to summary judgment as a matter of law on his Eighth Amendment claim.

### III. State Law Claims

Finally, plaintiff alleges medical negligence claims against defendants under Wisconsin law, which are only before this court through exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a). When all of plaintiff's federal claims have been dismissed, and plaintiff has not alleged any other basis for the exercise of federal jurisdiction over his state-law claims, as here, district courts are encouraged to relinquish supplemental jurisdiction absent unusual circumstances. *See Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Because there are no unusual circumstances that would justify retaining jurisdiction in this case, therefore, the court declines to exercise any further jurisdiction over plaintiff's common law negligence claims and will dismiss those claims without prejudice so that plaintiff may pursue them in state court to the extent that they are not time barred.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #19) is GRANTED as to all of plaintiff's Eighth Amendment claims.

2) Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE under 28 U.S.C. § 1367(c)(3).

3) Defendant's motion to stay deadlines (dkt. #35) is DENIED AS MOOT.

4) The Clerk of Court is directed to enter judgment consistent with this opinion and close this case.

Entered this 5th day of August 2026.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge